**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **MARIA SALINAS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **VS.** ) | **Civil Action No.  SA-06-CA-729-XR** |
| ) | |
| **CITY OF NEW BRAUNFELS,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**ORDER**

On this date, the Court considered Defendant City of New Braunfels' Motion for Summary

Judgment.  For the reasons discussed below, the motion is **DENIED** (Docket No. 28).

**Factual and Procedural Background**

Plaintiff Maria Salinas filed this civil action for declaratory, injunctive, and monetary relief

against Defendant City of New Braunfels ("the City" or "Defendant") for alleged unlawful

discrimination based on Plaintiff's hearing disability.  Plaintiff asserted that Defendant discriminated

against her in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504") and Title

II of the Americans with Disabilities Act of 1990 ("ADA").

Plaintiff has bilateral, profound hearing loss, is deaf, and relies on the use of American Sign

Language ("ASL") to communicate.  She relies on ASL interpreters to communicate with people

who do not sign.  Plaintiff alleges that the City failed to provide her with appropriate auxiliary aids

and services, failed to provide her with the opportunity for effective communication, and failed to

ensure the reasonable accommodation of her disability during her interaction with the New

Braunfels' police and other City personnel after she called "911" to report an emergency.

On September 23, 2004, Plaintiff returned home to her apartment after work and found her boyfriend, Ed Spencer, lying motionless on her couch. It was later determined that Mr. Spencer was deceased. Unable to rouse him, Plaintiff went to her neighbor's apartment for assistance and they returned to Plaintiff's apartment, where they called 911 to request emergency assistance and the services of a qualified ASL interpreter. Plaintiff alleges that although the police knew from the 911 call that she was deaf and needed interpreter services, the police did not attempt to locate an interpreter and failed to assign this task to another City employee. As a consequence, Plaintiff asserts none of the responding officers were able to communicate effectively with her.

After the police arrived at the scene and determined that Plaintiff needed interpreter services, Plaintiff alleges the police refused to attempt to locate two interpreters whose names were given to them. Apparently, one of those two interpreters contacted the police at the scene by phone and informed an officer that Plaintiff would need an interpreter in order to communicate. This interpreter allegedly told the officer the phone number to call to obtain paid interpreter services because the interpreter speaking on the phone was unable to leave her work and interpret at the scene. The officer allegedly refused to seek paid interpreter services after being given the phone number.

Without an interpreter present, Plaintiff alleges she was unable to understand what was going on in her apartment, did not know what functions the police were performing, remained unsure about Mr. Spencer's prognosis, and became increasingly distraught as she was left out of the many communications taking place around her.

An officer attempted to communicate with Plaintiff by going to the manager of the apartment complex to learn if anyone on the premises knew sign language. The manager was familiar with the

sign language alphabet, but was not able to communicate in ASL. The assistant manager's knowledge of the alphabet was so limited that she could not communicate effectively with Plaintiff, who became frustrated from being unable to communicate with the police.

Plaintiff alleges that the officer relied on the apartment manager's minimal knowledge of the alphabet in order to obtain Plaintiff's permission to conduct a search of her home and to ask her questions about her boyfriend's illness and use of medications. Instead of obtaining an interpreter, the officer allegedly directed Plaintiff to her bedroom and motioned for her to wait there. A police officer eventually came back into the room and indicated on a written note that he needed to search her bedroom.

An ASL interpreter eventually arrived.[1] Plaintiff alleges that after some delay, the police eventually gave the interpreter access in order to facilitate communication, but the police refused to pay for any interpreter services. Plaintiff avers that prior to the interpreter arriving at the scene, no officers were successful in communicating any information concerning Mr. Spencer's condition or the purpose, phase, or results of their investigation.

Plaintiff alleges that as a result of the New Braunfels' police and emergency personnel's actions and inactions and discriminatory conduct, she has sustained damages including but not limited to loss of self esteem, emotional distress, mistrust of the police, continued feelings of isolation, and segregation. Plaintiff alleges that the police never provided her with the name of their ADA or Section 504 Coordinator or information concerning how she could obtain appropriate auxiliary aids or services in order to follow-up on the results of their investigation. Furthermore, she

---

[1] Defendant concedes that approximately 1.5 hours passed from the time emergency personnel arrived until Plaintiff obtained the benefits of an interpreter.

alleges that the City's police department lacks a coherent policy for responding to the basic and consistent communication needs of deaf and hard of hearing residents, in violation of Section 504 and the ADA.

Plaintiff brought a claim against the City under Section 504, claiming that she is a qualified individual with a disability.  She seeks to enjoin the City from committing further violations of Section 504, which she claims are likely to be repeated due to the City's alleged deficient police practices in servicing individuals who are deaf or hard of hearing.  Plaintiff also brought a claim under the ADA, claiming that the city failed to ensure that communications with her were as effective as communications with non-disabled individuals, failed to provide auxiliary aids and services, failed to modify policies, practices and procedures to avoid discrimination, and failed to provide notice of the designated ADA Coordinator, all in violation of the ADA's implementing regulations.

### Summary Judgment Standard

The Federal Rules provide that summary judgment "shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."[2]  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[3]

---

[2] FED. R. CIV. P. 56(c).

[3] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings, but must present evidence setting forth "specific facts showing a genuine issue for trial."[4]  The trial court must resolve all reasonable doubts about the facts in favor of the nonmovant.[5]

### Legal Standard

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[6]  A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."[7]

The language of Title II generally tracks the language of Section 504 of the Rehabilitation Act of 1973.[8] Congress' intent was that Title II extend the protections of the Rehabilitation Act "to cover all programs of state or local governments, regardless of the receipt of federal financial

_____

[4] FED. R. CIV. P. 56(e)(2).

[5] *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 456 (5th Cir. 2005).

[6] 42 U.S.C. § 12132.

[7] 42 U.S.C. § 12131(1)(B).

[8] 29 U.S.C. § 794(a). Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." *Id.*  A "program or activity" includes "all of the operations of . . . a department, agency, special purpose district, or other instrumentality of a State or of a local government . . . ." 29 U.S.C. § 794(b)(1)(A).

assistance" and that it "work in the same manner as Section 504."[9]  In fact, the statute specifically provides that "[t]he remedies, procedures and rights" available under Section 504 shall be the same as those available under Title II.[10]  The Fifth Circuit has held that jurisprudence interpreting either section is applicable to both.[11]  Title II further directs the Attorney General to promulgate regulations to effectuate the statute's purpose.[12]  In fact, the United States Department of Justice publishes a guide for law enforcement officers that provides basic information regarding ADA requirements for effective communication with hearing-impaired persons.[13]

Courts have broadly construed the "services, programs, or activities" language in the ADA and the Rehabilitation Act to encompass "anything a public entity does."[14]  Thus, a municipality's

---

[9] H.R. Rep. No. 101-485, pt. III at 49-50 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 472-73.

[10] 42 U.S.C. § 12133.

[11] *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).

[12] 42 U.S.C. § 12134(a) (*see* 28 C.F.R. § 35, *et seq.*).

[13] COMMUNICATING WITH PEOPLE WHO ARE DEAF OR HARD OF HEARING: ADA GUIDE FOR LAW ENFORCEMENT OFFICERS, http://www.usdoj.gov/crt/ada/lawenfcomm.pdf (last visited Mar. 13, 2008).  This pamphlet advises law enforcement officers that "an interpreter may be needed in lengthy or complex transactions - such as interviewing a victim, witness, suspect, or arrestee - if the person being interviewed normally relies on sign language . . . to understand what others are saying."  The pamphlet also directs law enforcement to "not expect or demand that a deaf person provide his or her own interpreter.  As a rule, when interpreter service is needed, it must be provided by the agency."  Also, the pamphlet explains that the ADA requires law enforcement agencies to provide communication aids and services necessary to communicate effectively with deaf or hard of hearing people, to give primary consideration to the aid or service chosen by the hearing disabled person, to refrain from charging deaf or hearing impaired people for communication aids or services, and to provide effective, accurate, and impartial communication aids or services.

[14] *Burden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001)); *Yeskey v. Pa. Dep't of Corr.*, 118 F.3d 168, 171 (3d Cir. 1997), *aff'd* 524 U.S. 206 (1998); *see Johnson v. City of Saline*, 151 F.3d 564, 569 (6th Cir.

911 emergency response services fall within the category of "services, programs, or activities" covered by the ADA and Section 504.

A plaintiff can succeed in an action under Title II if she can show that, by reason of her disability, she was either "excluded from participation in or denied the benefits of the services, programs, or activities of a public entity," or was otherwise "subjected to discrimination by any such entity."[15]  To prevail on a claim under Section 504 or the ADA, a plaintiff must prove that the discrimination was intentional; proof of deliberate indifference is not required.[16]  A municipal police department qualifies as a public entity.[17]  "The broad language of the statute and the absence of any stated exceptions has occasioned the courts' application of Title II protections into areas involving law enforcement."[18]

Pursuant to the C.F.R., "[a] public entity shall take appropriate steps to ensure that communications with . . . members of the public with disabilities are as effective as communication

---

1998)(concluding that "services, programs, and activities include all government activities" and that the language "encompasses virtually everything that a public entity does"); *Innovative Health Sys,, Inc. v. City of White Plains*, 117 F.3d 37, 45 (2d Cir. 1997), *superseded on other grounds by Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n.7 (2d Cir. 2001) (stating that the "services, programs, activities" language of Title II "is a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context"); 29 U.S.C. § 794(b)(l)(A) (defining "program or activity" as used in the Rehabilitation Act as "all of the operations of" a qualifying local government); H.R. Rep. No. 101-485(II), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367 (noting that Title II "simply extends the anti-discrimination prohibition embodied in Section 504 [of the Rehabilitation Act] to all actions of state and local governments").

[15] *Hainze*, 207 F.3d at 799.

[16] *Delano-Pyle v. Victoria County*, 302 F.3d 567, 575 (5th Cir. 2002).

[17]  See *Hainze*, 207 F.3d at 799.

[18] *Id.*

with others.[19]   Additionally, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service . . . conducted by a public entity."[20]   A "qualified interpreter" is included within the definition of an auxiliary aid and service.[21]

## Analysis

In its motion for summary judgment (Docket No. 28), the City lodges several arguments. First, the City argues that the provision of 911 emergency services is not within the ambit of "services, programs or activities" as stated in the ADA and the Rehabilitation Act.  Second, the City argues there was effective communication between Plaintiff and the New Braunfels Police Department ("Police") and that such communication did not constitute exclusion from or denial of the benefits of a public service.  In the alternative, the City argues that the Police did not refuse to provide an interpreter, but actually attempted to acquire one for Plaintiff's use.  Lastly, the City asserts that, because there was no exclusion from or denial of the benefits of a public service, there was no discrimination, let alone intentional discrimination, premised upon Plaintiff's disability.

**Are 911 Emergency Services within the Scope of the ADA and Rehabilitation Act?**

As stated above,[22] as well as in this Court's Order on the City's Motion to Dismiss (Docket No. 11),[23] a municipality's 911 emergency services fall within the protections of the ADA and the

---

[19] 28 C.F.R § 35.160(a).

[20] 28 C.F.R. § 35.160(b)(1).

[21] 28 C.F.R. § 35.104(1).

[22] *See* n.11, supra.

[23] *See* Docket No. 11 at 6-7.

Rehabilitation Act.

The more difficult question concerns the scope of the emergency services.  It is clear that the City, as an emergency responder, has a duty to provide such services to a person in peril. It is unclear, however, whether any further duty is owed by the City to persons who stand in a special relationship to the one in peril.  Without deciding whether 911 emergency services entail a duty to provide services to those who hold a special relationship to the person in peril, the Court finds that once the emergency responders make an effort to communicate with and extract information from such a person, the public entity has a duty, under the ADA, to ensure that a disabled person is "afford[ed] . . . an equal opportunity to benefits from the services provided by Defendant to [those] who do not suffer from a hearing-impairment."[24]  Because the New Braunfels police purposefully engaged in communications with Plaintiff, conducted an investigation in her apartment, sought information from her pertinent to that investigation, and remained in her apartment at least 1.5 hours, it is clear the City had a duty to provide her with equal access to its services as would be afforded a non-hearing impaired individual.

**Was There Effective Communication Between the City and Plaintiff?**

The City is obligated to ensure that communications with disabled persons are as effective as communication with other, non-disabled persons.[25]  Due to the broad, encompassing language found in the ADA, the term "effective" lends itself to a fact-intensive inquiry, making determination difficult on summary judgment.

---

[24] *Falls v. Prince George's Hosp. Ctr.*, 1999 WL 33485550 at *8 (D. MD. 1999).  *See also*, 28 C.F.R. § 35.160.

[25] 28 C.F.R. § 35.160(a).

The City argues that communications between its officers and Plaintiff were as effective as communication with a non-disabled member of the public. To support this contention, the City offers the deposition testimony of New Braunfels Police Department Officer Jermyn Baker ("Baker"), New Braunfels Police Department Detective Tarina Skrzyki ("Skrzyki"), and Plaintiff Maria Salinas. Baker testified that from his communication with Plaintiff, he was able to obtain all the information he needed to conduct his investigation, and that because he was able to acquire this information, his communication with Plaintiff was effective.[26] Detective Skrzyki's testimony reveals that she utilized written communication to obtain information from Plaintiff.[27] Additionally, Skrzyki testified that "we communicated with her as well as we could. And we received the information we needed."[28] Skrzyki alleges that she was under the impression that Plaintiff was satisfied with the manner in which the New Braunfels Police handled the situation.[29] Lastly, Plaintiff testified that she was able to communicate effectively once an interpreter arrived.[30]

To counter Defendant's evidence on the issue of effectiveness, Plaintiff provides a barrage of evidence consisting of the deposition testimony of Plaintiff, Officer Baker, New Braunfels Police Department Captain John Villareal ("Villareal"), Detective Skrzyki, and the manager of the apartment complex where Plaintiff resided, Tonya Talbert ("Talbert"), as well as a New Braunfels

---

[26] Docket No. 28, Ex. C. - Baker Deposition at 180:3-4. See also, pp. 193:18-19 ("[The communication] was totally effective for what I needed.").

[27] Docket No. 28, Ex. B. - Skrzyki Deposition at 191:1 - 193:18.

[28] *Id.* at 177:24-25.

[29] *Id.* 180:1 - 181:5.

[30] Docket No. 28, Ex. A. - Salinas Deposition at 118:9.

Police Report ("Police Report") and the Expert Report of Jean Andrews, Ph.D. ("Expert Report").

Plaintiff's deposition testimony reveals she felt her communication with the police officers was "very frustrating" and "very hard";[31] she found it difficult to communicate with the police officers;[32] that she needed an interpreter "because [she] could not understand what was going on";[33] that she made a written request for an interpreter;[34] she had several important questions she wanted to ask the police officers;[35] and that she could not understand the attempted communication with Talbert, her apartment manager whom the police asked to interpret for her.[36]

In addition, Officer Baker testified that he was unsure whether Plaintiff understood some of the written questions he submitted;[37] despite his classification of the communication as effective, he was only able to obtain a couple of items of basic information, but nothing else from Plaintiff;[38] that Plaintiff's upset demeanor may have been due to her inability to communicate with him;[39] he did not share any information with Plaintiff, and he did not know what information she desired to receive;[40]

---

[31] Docket No. 32, App. I at ¶17.

[32] *Id.*

[33] *Id.* at ¶18.

[34] *Id.* at ¶19.

[35] *Id.* at ¶37.

[36] *Id.* at ¶54.

[37] *Id.* at ¶24.

[38] *Id.* at ¶25.

[39] *Id.* at ¶33.

[40] *Id.* at ¶34.

he did not know whether Plaintiff had any questions for him;[41] and he did not know whether Talbert could effectively communicate with Plaintiff.[42]

Captain Villareal testified it was his opinion that Officer Baker failed to obtain all of the information he should have acquired from Plaintiff;[43] he interprets Baker's police report as indicating Baker was experiencing difficulty communicating with Plaintiff;[44] he believed Plaintiff's difficulty in writing and the fact she was upset created communication difficulties for the officers on the scene;[45] he assumed that difficulties in communication remaining after the use of the apartment manager, Talbert, to interpret indicates Talbert's skills were somewhat lacking;[46] he had no knowledge to establish Talbert was communicating effectively;[47] and it is his opinion that effective communication involves both the officer getting the information he desires and the hearing-impaired person getting the information she desires, and that there must be a dialogue between the two.[48]

Detective Skrzyki testified that it would be necessary to talk to someone in Plaintiff's position to determine what had happened;[49] she wrote in her report that officers were unable to obtain

---

[41] *Id.* at ¶35.

[42] *Id.* at ¶53.

[43] *Id.* at ¶26.

[44] *Id.* at ¶30.

[45] *Id.* at ¶36.

[46] *Id.* at ¶49.

[47] *Id.* at ¶53.

[48] *Id.* at ¶61.

[49] *Id.* at ¶25.

certain information from Plaintiff;[50] on certain occasions Plaintiff did not understand her when she attempted to communicate;[51] communication with Plaintiff was important because Plaintiff was a witness who was being interviewed;[52] Plaintiff's written responses to certain questions were "kind of mixed up";[53] that communication requires both parties' participation, and when a deaf person is unable to ask questions they desire to ask, the communication is "not as good."[54]

Apartment manager Talbert testified that she lacked specialized skill in communicating with deaf persons;[55] she observed Plaintiff make a written attempt to have the police acquire an interpreter;[56] there was a general lack of communication;[57] she could not understand, and could not be understood by Plaintiff;[58] and that she did not indicate to the police officers that she knew sign language.[59]

Finally, the Police Report indicates that Officer Baker had a "difficult time communicating" with Plaintiff and believed Plaintiff was "extremely upset" and having difficulty communicating with

---

[50] *Id.* at ¶48.

[51] *Id.* at ¶55.

[52] *Id.* at ¶57.

[53] *Id.* at ¶58.

[54] *Id.* at ¶62.

[55] *Id.* at ¶45, 50.

[56] *Id.* at ¶46.

[57] *Id.* at ¶47.

[58] *Id.* at ¶51.

[59] *Id.* at ¶52.

him.[60]  Indeed, Detective Skrzyki wrote that officers were "still having trouble communicating" with Plaintiff.[61]  The Expert Report includes observations that, given the expert's assessment of Plaintiff's communication abilities, she  would likely be unable to ask certain questions without the aid of an interpreter;[62] and that Plaintiff would likely be unable to understand the written questions being asked by the police officers.[63]

In the context of the situation presented in this case, the ability to effectively communicate includes not only the act of receiving, but also the act of imparting information.  The evidence construed in the light most favorable towards the Plaintiff creates a genuine issue of material fact as to whether the communication between Plaintiff and the New Braunfels Police Department was effective.

Defendant's evidence focuses on a police officer's ability to acquire information needed to complete an investigation, but the City wholly fails to address the effectiveness of Plaintiff's understanding of her communication with the police officers.   Additionally, Plaintiff's own testimony succinctly points out that she only experienced effective communication *after* an interpreter arrived, making absolutely clear that she felt the communication before the interpreter's arrival was ineffective.[64]

---

[60] *Id.* at ¶29, 31.

[61] *Id.* at ¶48.

[62] *Id.* at ¶38.

[63] *Id.* at ¶59.

[64] Docket No. 28, Ex. A. - Salinas Deposition at 118:6-7.  The Court again notes that at least 1.5 hours passed from the time emergency services personnel arrived until the interpreter arrived.

-14-

The evidence establishes the City knew that two-way communication is necessary for the communication to be effective. Here, there is substantial evidence indicating a lack of the type of quality bilateral communication necessary for the establishment of effective communication. Additionally, the evidence shows that from the City's point of view, it was experiencing some difficulty in its communication with Plaintiff, and that the City was unsure whether Plaintiff was able to communicate information or questions to its police officers.

Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment on the issue of whether there was effective communication.

**Was There Refusal or an Attempt to Acquire an Interpreter?**

As a public entity, the City is required to provide individuals with disabilities an equal opportunity to enjoy the benefits of public services, such as 911 emergency services. Therefore, a determination of the viability of a claim for violation of the ADA and the Rehabilitation Act requires an analysis of whether the public entity made an attempt to furnish adequate auxiliary services to Plaintiff. However, this inquiry is not dispositive, and comprises a part of the larger inquiry of whether effective communication was provided, an inquiry concerning which a genuine issue of material fact exists.

The City contends it made attempts to get an interpreter for Plaintiff. To support this contention, the City cites to the deposition testimonies of Detective Skrzyki, Officer Baker, and New Braunfels Police Department Dispatch Supervisor Kelly Holder ("Holder"), as well as several Police reports.[65] Skrzyki testified she, without having contact with Plaintiff, asked another police officer

---

[65] Docket No. 28 at 5.

-15-

if they could get an interpreter.[66]  Baker testified he was instructed to try to get an interpreter for

Plaintiff, and that he placed at least one phone call to a person who knew Plaintiff and could sign,

but that person was unavailable.[67]  Baker also testified he attempted to call two or three other

numbers, but that he was unsure whether the numbers were those of interpreters.[68]  Holder testified

that within eight minutes of receiving Plaintiff's emergency call a dispatcher attempted to contact

an interpreter by the name of Linda Schrank, and that this interpreter was listed in a file containing

providers of various services that may be needed to respond to multifarious emergencies.[69]  Lastly,

certain police reports indicate that efforts were made to get an interpreter to the scene.[70]

    To counter the City's contention, Plaintiff argues she was deprived of "critically important"

services in that the City, despite its present assertion to the contrary, did not make an attempt to

procure interpreter services.[71]  In support of this position, Plaintiff offers evidence showing that

Defendant has provided shifting and contradictory grounds as to why it failed to seek an interpreter.[72]

Evidence shows that the City did not attempt to procure an interpreter for the following, sometimes

conflicting, reasons: the police thought that another interpreter was en route;[73] Plaintiff was not in

_____

[66] Docket No. 28, Ex. B. - Skrzyki Deposition at 165:20 - 25.

[67] Docket No. 28, Ex. C. - Baker Deposition at 108:16 - 109:2.

[68] *Id.* at 109:18 - 110:9.

[69] Docket No. 28, Ex. E. - Holder Deposition at 30:7 - 34:7.

[70] Docket No. 28, Ex. D. - City Police Reports.

[71] Docket No. 32 at 2.

[72] *Id.* at 6-7.

[73] Docket No. 32, App. III at ¶1 (noting the confusion as to whether an interpreter was on her way to the scene).

custody;[74] written communication between the police and Plaintiff was effective;[75] it would have

taken too long to obtain an interpreter;[76] apartment manager Talbert's communication with Plaintiff

was effective;[77] there was no list of interpreters to call;[78] Plaintiff was in too excited an emotional

state for an interpreter to be of much use;[79] there was no emergency;[80] and there was no need for

precise communication.[81]

Because a genuine issue of material fact exists as to whether New Braunfels police called or

attempted to acquire an interpreter, and because this inquiry is part of the more encompassing

determination of whether effective communication was achieved, the Court **DENIES** Defendant's

Motion for Summary Judgment on the issue of whether Defendant made an attempt to acquire the

---

[74] *Id.* at ¶4 (citing various deposition testimonies to the effect that a deaf person not in custody would not require provision of an interpreter).

[75] *Id.* at App. I at ¶¶27-33; 48-63; App. III at ¶2.  Also, the Court has decided a genuine issue of material fact exists as to whether communication was effective.

[76] *Id.* at App. III at ¶¶5-10; Exs. 12-14 (indicating the police were reluctant to seek an interpreter because of the possible delay; however, other evidence indicates interpreter services were within 15 to 30 minutes' drive from Plaintiff's apartment).

[77] *Id.* at Ex. 22; App. I at ¶¶44-63; App. III at ¶3 (noting difference in facts as to whether Talbert was able to communicate effectively).  Again, the Court has decided a genuine issue of material fact exists as to whether communication was effective.

[78] *Id.* at App. III at ¶¶11-13 (indicating a lack of either a policy or contract concerning the acquisition of interpreter services for use in emergency responses).

[79] *Id.* at App. III at ¶14 (testifying that Villareal might have acquired a fee interpreter if Plaintiff had been more calm).

[80] *Id.* at App. III at ¶15 (testifying that had Villareal been on the scene, he would have obtained an interpreter had there been an emergency).

[81] *Id.* at App. III at ¶16 (noting that if the instant situation were one that required precise communication, an interpreter would have been called).

services of an interpreter.

**Was the Discrimination, If Any, Intentionally Premised on Plaintiff's Disability?**

In support of its contention that the City did not engage in intentional discrimination necessary to a Section 504 or ADA claim, Defendant relies on an unreported 11th Circuit case[82] and its allegations that communications were effective.[83]

The *Saltzman* case involved a hearing-impaired stroke patient and his similarly disabled wife. The Plaintiff brought claims under Section 504 and the ADA for the hospital's alleged failure to provide interpreters for both the patient and his family.  The *Saltzman* trial court ruled that there was no intentional discrimination, thus plaintiff had no cause of action under Section 504 or the ADA.[84] In affirming the decision of the trial court, the Circuit Court noted that the hospital "had a policy in place for assisting hearing-impaired patients, . . . [and] [t]here is no evidence . . . any . . . policymaker intended or expected [discrimination against] hearing-impaired people."[85]  The court further reasoned that attempts to obtain interpreters, while possibly negligent, were insufficient to satisfy the intentional discrimination requirement needed for plaintiffs to prevail.[86]  Additionally, the Circuit Court did not find that the hospital's policy was inadequate or routinely not followed.[87]

---

[82] *Saltzman v. Bd. of Comm'rs of the N. Broward Hosp. Dist.*, 239 Fed. Appx. 484 (11th Cir. June 15, 2007).

[83] As set forth above, the Court finds that a genuine issue of material fact exists as to whether communication was effective.

[84] *Saltzman*, 239 Fed. Appx. at 485.

[85] *Id.* at 488.

[86] *Id.*

[87] *Id.*

The applicable standard for intentional discrimination necessary for recovery of compensatory damages remains unclear in the Fifth Circuit.[88]  However, Plaintiff argues that the factual scenario present in the instant case exceeds the facts of an analogous case in which the Fifth Circuit found that the facts satisfied the standard of intentional discrimination.  Plaintiff cites to *Delano-Pyle* as the key case on the issue of intent for the Fifth Circuit.[89]  Plaintiff offers the evidence previously cited to establish a fact issue regarding effectiveness of communication, as well as to show that the police officers were aware their unsuccessful communication efforts were harming her;[90] Officer Baker disregarded advice from one of Plaintiff's contacts concerning the process and importance of acquiring interpreting services;[91] and the dispatch officer, with knowledge of Plaintiff's hearing-impairment, took no action to contact an interpreter.[92]  Plaintiff argues that the evidence presented is congruent with, and even exceeds that found in *Delano-Pyle*. This Court agrees with Plaintiff's contention insofar as the facts construed in a light most favorable to the Plaintiff indicate a genuine issue of material fact exists regarding the issue of whether the City's conduct was intentional.

---

[88] *Delano-Pyle v. Victoria County*, 302 F.3d 567 (5th Cir. 2002) (noting that "deliberate indifference" is not the standard for intentional discrimination under the ADA and Rehabilitation Act while refraining from articulating the necessary criteria for intentional discrimination).

[89] Docket No. 32 at 16 (citing *Delano-Pyle*, 302 F.3d 567 (5th Cir. 2002) (upholding jury finding of intentional discrimination where police officer, with knowledge of plaintiff's hearing-impairment, failed to ascertain both plaintiff's preferred manner of communication and whether plaintiff understood the police officer's instruction, prior to administering sobriety tests).

[90] Docket No. 32 at App. I at ¶33 (testifying that Plaintiff's inability to communicate with police officer "could be frustrating" and cause her to be extremely upset).

[91] *Id.* at App. I at ¶¶39-42 (citing to Ex. 11 - Affidavit of Tami Klett).

[92] *Id.* at App. I at ¶¶1-16.

Notwithstanding the creation of fact issues, Plaintiff goes to great length to distinguish the *Saltzman* case. Besides being merely persuasive and non-binding authority, the Court is of the opinion the instant case is easily distinguishable from the facts in *Saltzman*. First, unlike the *Saltzman* case, the Plaintiff in the case at bar has provided evidence indicating an absence of a policy for either dealing with hearing-impaired citizens or acquiring interpreter services.[93] Additionally, Plaintiff has provided evidence which creates an issue of fact regarding whether the City attempted to acquire interpreter services,[94] whereas, the hospital in *Saltzman* at least made attempts to obtain an interpreter. Lastly, Plaintiff offers evidence, including an expert's report, pointing out certain deficiencies in, or the total lack of, training, policies and procedures for handling cases involving hearing-impaired persons or acquiring interpreter services to facilitate communication between the police and hearing-impaired persons.[95]

Based on the combination of a genuine issue of material fact and the clear distinguishability between the non-binding *Saltzman* case and this one, the Court **DENIES** Defendant's Motion for Summary Judgment on the issue of whether the City's acts were intentional.

---

[93] *Id.* at App. V.

[94] *Id.* at App. I at ¶¶1-16; 39-42.

[95] *Id.* at App. V, Ex. 17.

**Conclusion**

For the foregoing reasons, the Court **DENIES** Defendant's Motion for Summary Judgment (Docket No. 28) in its entirety.

It is so ORDERED.

SIGNED this 14th day of March, 2008.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE